We have four cases on our calendar this morning, two patent cases from district courts, an employee case from the Merit Systems Protection Board and a veterans case which is being submitted on the briefs and not argued. Our first case is Virginia Innovation Sciences v. HTC Corporation et al. 2017-14-82, Mr. Devlin. And I should say, Curtis Amazon as well. Thank you, Mayor. Please, the court. The inventions of the 492 patent family are not abstract. They're quite specific. Here's one. It's my phone. It's not just any phone. A phone can receive a signal from a cellular network. It can process and convert that signal in ways that were unheard of at the time of the invention using components that were unheard of at the time of the invention. And it can send a new signal out to a big screen TV. So I can watch a movie in full HD glory while at the same time receiving power from the TV back to the phone to charge it through the same cable. That's not an abstract idea. But don't the claims essentially reside receiving data, processing data, and providing and displaying data? Well, this is the fundamental game we play with Alice. We always have to look at the claims as being what's some essential idea. Well, you could call it a game, but it's a Supreme Court precedent that we have to follow. We do have to follow it, and indeed we shall and we do. The issue and the problem is whenever we distill that out, Alice has a couple of catches for us. Alice has some filters, step one and step two. And the first filter is the thing we filter out, is that abstract? And here, if you filter out something like the court just said and like the district court found, that is receiving a signal, processing it, and sending it out, that by itself is abstract. The question is, is that a fair distillation of the claims? That's step one. And then step two says, whether it is or whether it's not, when you distill that out and you compare it to the actual ordered combination of each of the individual claims, does the individual claim connote something more? Is there something inventive there? So of course the district court found a distillation of the claims. What I would submit, what VIS submits, is that distillation was not a fair abstraction. So under step one, there is no abstract idea here, but if that is the abstract idea and the claims do not meet step one each individually, then when you look at any one of them as an ordered combination of elements and compare that to the abstract idea, you see something considerably more, as the Supreme Court said. So what's wrong with what Judge O'Grady said when he said it looks like the core concept here is prepping a video data signal so that it can be used on some other monitor other than a mobile phone monitor. And everything recited in the claim is just conventional components used in conventional ways. There is the videos coming in compressed. You decompress it. You need to prep it, encode it, either for a digital monitor or an analog monitor. These communications can be done wirelessly or wired. And the actual conversion of how you take a video signal that's designed for some very little screen and then convert it somehow in this magic conversion module box so that it can be blown up on a screen that's maybe 20 times bigger, that's not really explained in the spec nor in the claim other than just a reference to something called the conversion module. So taking all that into account, what was wrong with Judge O'Grady's analysis in concluding that this is just an idea of converting a signal for one format to another format and then everything that's recited in the claim to apply that idea is just conventional stuff? Let me take that in parts. There's a lot there. The first is the idea that everything's conventional. What BASCOM says is that in the word combination that's invented, even of conventional elements can be invented and patent eligible under Section 101. So the notion that something is just a collection of conventional elements is insufficient to find ineligibility under Section 101. The second, I think, sort of assumption inherent in the question is that there really is nothing in the patent that describes this so-called magic box. And that harkens back to the Internet Patents case where there was functionality described but no real description of how that takes place. The district court here really ignored evidence. When the district court analyzed this conversion module, it looked specifically at Figure 2 of the patent. And Figure 2 of the patent is quite generalized in how it appears of its description of the conversion module, this MTCSM. And for the record, I'm looking at the district court's opinion on Appendix 26. And the district court says, an examination of this figure confirms that the MTCSM indeed describes an ends rather than a means. The problem is there's more description in the patent. The very next figure, Figure 3, has a very detailed picture and an associated description of all the components and features that actually make this work. And that conversion module is a new component. It's something that was not known in the art. The collection of these elements is something that was not known in the art. So it meets that BASCOM standard of a new and unconventional ordered combination of elements. And Figure 3, just one example of it in the record, would be at Appendix 66. That's in the 492 patent, the primary patent. And it describes an interface buffer, a video compression decoder. What I'm wondering is if you were at Node A and you had a compressed video signal and you wanted to transmit that to Node B, which would be for a digital monitor, you would necessarily have to do the conventional step of decompressing. And you would necessarily have to do the conventional step of encoding it for that specific standard for that particular digital monitor. I don't understand where the invention lies in prepping a signal that is compressed to be displayed on a digital monitor, where you necessarily have to decompress the compressed signal and then encode it according to the standards for that particular digital TV. Well, I guess what begs the question here is that now are we at a real abstract idea or not? We've all walked in with the assumption in some ways here that taking information from a cell phone, that I somehow have a right to have the movie Avatar come to my cell phone in a way that I can now convert it to my HD TV. And that was actually a very new concept back at the time. The whole collection of these elements, I would submit, is not abstract. So it is a new concept. Isn't that still a concept? I guess what I'm saying is a new abstract idea is still an abstract idea, which is impermissible under Section 101. I mean, our court has said that much. And that is true. That's right. And so a new abstract idea running on a generic computer network would also be an abstract idea. That I don't know. I think you have to think about how it is. Okay, let's accept that it is. A new abstract idea running on a generic computer is invalid under 101. If that's all you have, but if the implementation is to be able to do it. A new abstract idea running on a Dell computer, that would also fail under Section 101. And then if you tacked on using a Samsung monitor with that Dell computer running that new abstract idea, that also wouldn't pass muster under Section 101. The focus has to be the abstract idea itself, whether it's new or not. To what extent are there details in the claim that implement that abstract idea in a way that we have now converted that otherwise very broad concept into something more concrete that we can say, aha, now that's an inventive concept, that's an inventive implementation, or at least an implementation of said new abstract idea. So that's what we're looking for in this claim at this point. Understood. Just to address something inherent in the question, there is other disclosure in the specification that talks about the specific implementations of how this works. For example, at Appendix 73, there's certain buffer sizes and various buffers that are provided, throughput rates, and so forth. Some of those throughput rates are actually recited in the claim. Some of the more narrow claims recite specific combinations of features that involve, and I'll pull up one. I'm going to pull up Claim 51 of the 451 patent, and that's at Appendix 111. 51 depends from 50. 50 depends from 49. 49 depends from independent claim. Which claim are you pulling up again? Thank you. It is Claim 51 of the 451 patent. That's 8903451. And it's on Appendix 111. And obviously, we're deep into the dependent claims here, but that's the point. Each of these dependent claims is an ordered combination, including all the claims that it depends from. And if you look at it, it has some conventional computer components, a processor, a memory, etc. It has a high-definition digital output interface. Now, query whether that was something that it would use with a cell phone, whether that combination itself, whether you've removed yourself from an abstraction. I think you have. There's not an assumption in life that we get to watch HGTV from our cell phone. There is a million ways that I can look at content on my TV. There are a million ways I can use my cell phone. This patent claims a very specific combination of components and features that was heretofore unknown, and it's quite specific. When we think about it now, when you call it a generalized abstract idea, you can call it that. And the district court did that. It talked about a generalized problem of sending the video from your cell phone to a larger screen. It's not really a generalized problem. It's a very specific problem that these inventors foresaw, that these inventors uncovered and thought about, and they came up with a specific solution. And as we go down to, I'm still in claim 47, which is the independent claim. That's that HD output interface. It talks about a cellular system, not just any system. That's an inventive concept? Sorry? Using a cellular system is the inventive concept? No, no, no. Not at all. I'm just saying when you confine, start to confine the invention with this combination of features, the collection of them says something significant more than the abstract idea. Well, I guess, you know, the Bilski's claim was a hedging method, right? And if that was done on a computer, that would still be no good. And if the communications back and forth to set up the hedging contracts was done using a cellular network, that would also be no good, right? Well, I'm not sure about that. It depends on what you would need to do to implement that on a cellular network back at that time. It may very well have required new technology, new components in a collection that was unconventional and that would meet the BASCOM standard. So without knowing more information, we just don't know. And here we do have that information, which leads to another problem with the district court's analysis, which I'll get to in one second. But if you go down to claim 51, there's even more features here, including a maximum throughput rate. So there's a specific throughput rate that's received. Counsel, you're into your rebuttal time, which you wanted to save, so you have a choice. I will note one other point, which is the preemption analysis here. The district court actually grouped all of the claims together, the entire family, and said that family covers certain technology. It's like saying Qualcomm's portfolio, I can't even make a call without infringing it, so all those patent claims are invalid. I mean, it doesn't work that way. Each individual claim recites a very narrow subset of technology. That's quite different. An order combination of features that's far different from the very broad abstract idea that the district court utilizes in analysis. Thank you. And thank you for the reminder, John. Mr. Haddon, you're going to take eight minutes. May it please the court, Dave Haddon for Amazon. I'm splitting the argument with HTC's counsel. I will address primarily step one, and you'll address step two, but I'm happy to answer any questions you have. The idea, and there's no dispute that these claims are directed to the idea of sending video from a mobile device to another screen. That's what the patent says in the first sentence of the abstract. You and your co-defendant have different articulations for the abstract idea, right? They're different, but I think equivalent. One is sending video from a mobile device to a different screen, and the other is converting the video for use on a different screen or words to that effect. Both describe the same idea, which is it would be cool if I could watch what's on my phone on a bigger screen. And that, what I hear from BIS's counsel, is the claimed new concept. But as Your Honor pointed out, a new idea, a new abstract idea, is not a patentable invention. What is required under step one is a specific means or mechanism for achieving that result, and not just the result itself. In that regard, this case is indistinguishable from TLI, Affinity Labs, or two-way media. The idea of sending video from a mobile device to a different screen is no more of a concrete solution than sending a digital image from a mobile device to a server, or sending media from a server to a mobile device in Affinity Labs. Well, what more would you want than what is shown in figure three for the conversion module? Sure. It's doing the decompression, it's doing the encoding according to whatever the needs are of a particular monitor. There seems to be some details inside the conversion module. There is a diagram in figure three, and just to correct the record, it was addressed by Judge O'Grady. We discussed it at the hearing, and he refers to it in his order. But if we look at figure three, and this is Appendix 66, all it really shows is a signal coming in from a mobile device, that is, in some undisclosed, compressed form. And coming out on the other end is a series of standard video outputs, either digital or analog. Basically, every kind of cable that, at the time, you could plug into the back of your TV. And in between, there is nothing but a box that says, two boxes really, one that says decompress. And of course, any video that is compressed has to be decompressed at some point. And there's no dispute that there is no new compression technology at issue here. And then there is the digital, analog, or digital video encoder. And that is really the magic box within the magic box. Because if there is going to be a specific solution here that actually converts a signal that is destined for a cell phone screen into something that you can show on an HDTV, it has to happen there, right? How do you convert... Right, so they've shown us the full contents of their magic box, decompression encoding. And that is not the solution, right? The solution has to be, how do you actually take the compressed signal, decompress it, and then encode it in a new manner to fit the requirements of the new display? And that is nowhere described. Throughout the patent and the claims, what they say is, do what is appropriate, right? Output the power level that is appropriate for the display device. That is just an invitation to somebody else to create a solution. The same regard with the buffering, right? They say buffer and throughput are determined as desired by the designer, right? There is no solution here to actually perform what the claim requires, to achieve that output. And much more importantly, there is no limitation on how that could be performed. So throughout this patent, they also refer to this being done either using conventional, well-known technology or to-be-developed technology. So they're actually trying to capture other ways to do it that no one has even developed yet. So this is nothing but a box with intervening functional results that add nothing to a specific solution. And in that regard, it's no different from TLI and Affinity Labs, right? As this court held in Affinity Labs versus DirecTV, buffering content was conventional. It was conventional four years before this patent. And as far as compressing images, this court held in TLI, that image compression and recompression was conventional eight years before this patent. So none of the inner boxes within Figure 3 could provide an inventive concept. They're conventional as a matter of law. And there's no—and acknowledged as conventional within the patent specification itself. So at the end of the day, this is an aspirational patent, right? It has basically four pages of written description, no actual solution for achieving the result. And like the patents in Affinity Labs and TLI, it claims every possible way to do it. Are you saying it's not enabled? I don't think it's enabled, but that's not the issue here today. The issue here today is whether there is a specific solution in the claim or just a claim to the concept. And here, all we have is a claim to the concept with some recitation of generic machinery, which, as this court said in McGraw and in Two-Way Media, is specifically what fails at step one, right? At step one, you need a specific improvement to the technology, not the result itself. You're almost suggesting it could be patent eligible with a little more disclosure. Excuse me? I'm sorry? You're almost suggesting that it could be patent eligible with a little more disclosure. No, I think if they had disclosed a specific algorithm for converting a signal in one format into a required format for a different device and had claimed that algorithm, that could be a specific solution that could be patented. But the idea of doing that generally, taking some input intended for a mobile device and somehow making it work on a bigger screen, that is nothing but an idea. So you're saying an algorithm, which is an abstraction, added to an abstraction, might lead to a patent eligible invention? Sure. I mean, EnFish, right? EnFish, a self-referential table and a four-step algorithm. Doesn't it depend on what's in the algorithm? Excuse me? Doesn't it depend on what's in the algorithm? Absolutely. It's inventive? Absolutely. So in EnFish, there was an inventive algorithm and a new data structure. That was patentable. There's no such thing here. They don't even pretend that there's such a thing. The phone that he held up is nowhere described in this patent, right? All that's described in this patent is the use of a conventional existing cell phone and a magic box. It is not disclosed. If you have no further questions, I'll turn it over to my co-counsel. Fine. Thank you very much, Mr. Tchaikovsky. Thank you. Please support George Tchaikovsky on behalf of HTC. Following up with some of the questioning just received by my co-counsel, the black box or the intermediary device that is claimed in this patent, it only exists in 26 of the claims that are identified. Most of the claims don't have it. And that goes to the issue that it's really functional claiming that we have here. Compression, decompression, as we've discussed, not a specific black box that is in Figure 3. That being said, if we even focus on Figure 3 of the patent, that may be an example. That example is abstract. As stated in the 492 patent, Column 4, Lines 49 through 55, which is A72, any conventional or to-be-developed execution platform may be used for this black box, this MTSCM intermediary device. The processor, memory, and related elements, such as power supply, are well-known and need not be described herein, maybe like a written description, to convey an understanding of the invention. That's what's told to us by this patent, is it can be anything. It doesn't matter what it is. And so maybe there's a figure in there. But what we have in this patent is statements that clearly state it can be anything, and that applies to other elements. At the district court, before Judge O'Grady, we only had four elements that were identified by the patent holder as being somewhat, perhaps, inventive. That was the intermediary device, and as I just stated, that only existed in some claims, and it's a conventional known technology. That's, again, A72, also replete in Column 4. The patent says it can be located anywhere. It can be located in either the mobile terminal, the external display. It can have fewer, greater, or differently named modules from those in the figure. So the figure is not demonstrative of what's in the claims. And we look at the claims, given this court's jurisprudence, as to whether we have an abstract idea, and we do here. That's, again, A74 and A72-73. So they don't get to point to the black box that can be anything that is conventional and yet to be determined according to the specification. The other elements that they point to at the district court level was compression-decompression. Well, that was just using standard examples of MPEG compression, 1, 2, 3, 4. Nothing new there, put into a yet to be determined or conventional box. That's in the 611 patent, Column 6, 22-33, A209. And that applies for compression and decompression. Nothing new there, and the court, that is Judge O'Grady, stepped through all of that. In fact, we have slides in our appendix that step through each one of these, A1435-1461, that give you a pictorial representation with the specification sites of how each one of these elements are conventional, generic, and, in fact, the order of combination. Adds nothing new to the inventive concept. And as to the powering elements, which there are really two, adapting the power level and the ability to receive, that again in the patent says, A209, that's a 611 patent, Column 5, 1-4, that power supply is well-known. And you use an appropriate level. It doesn't even tell you what level to use of power. That's A208 in the 611 patent, Column 4, Line 33-36. Moreover... I'm sorry. Could you give me those two sites again? The power level sites were Column 5, 1-4, A209. It says the processor, memory, and related elements such as a power supply are well-known and need not be described to convey an understanding of the invention. And with respect to the output signal, which is Column 4, Lines 33-36, A208, the MTSCM, which again is yet to be determined device or conventional, processes the video signal to provide a converted video signal that has a display format and a signal power level appropriate. Whatever level that's appropriate for an external display. Going to what Your Honor, Judge Chen said earlier in terms of taking a signal, this patent, the claims are directed not to any display device or new intermediate device. The claims are directed to a signal, an intangible item, an abstract notion. A signal that is taken from one device, happened to be here a mobile terminal, and converted to another device, a TV. And the claims can be a television, some limited to an HDTV. That's all it is. I take a signal, a traditional abstract idea given this court's jurisprudence, whether I start with Supreme Court, Bilski, Alice, Ultra-Marshall, we look at the claims and what the claims are directed to, and the claims are clearly directed to that abstract idea, that signal, and the fact that we've ensconced it in a technological environment pursuant to Alice doesn't change the outcome of the result. I mean, more so on the power level, the patent cites to IEEE 1394, which the court may know as Firewire technology, which was available in 1995. We provided on Appendix 14.7 to the District Court that that standard allowed for power conversion and power signals to be sent from one device to another on a serial bus. And if the court looked at A1457 and 1458, you can see. So that was conventional, well-known, not something that was invented here. So we really don't have anything in individual elements that save this patent from the abstract idea. We don't have a combination. Even if we look at the dependent claims, which counsel for VIS would like to point to in Claim 51, there's nothing there but all of these elements, and the District Court Judge of Grady did consider them. And again, I'd say that some of this is waived because of the District Court. They only raised the four issues you see that we put in the slides in our appendix, and now they point to additional items. More so, as we look at dependent claims, the secured bail case is exemplary, right? It's just going to design choice, and the fact that we have design choice of these conventional elements doesn't all of a sudden save the claims as was stated. Oh, it was Affinity Labs versus DirecTV. My apologies. All recite functions that are not inventive but simply constitute particular choices from within the range of existing content or hardware. And that's what's taken here, is these generic elements that don't give you the how, Internet Patents Court, don't give you the specificity in the claims. And again, maybe I've got a new abstract idea, but it's still an abstract idea, and I haven't taken it out of the abstract by appending a Dell computer or a Samsung HDTV. And that's what we have here. Are all 300-plus claims, is there a case for controversy here on all of them? Absolutely, there is, Your Honor. In both cases, in the Amazon case, and all that matters is, for example, one case, and then the claims are invalidated. In the Amazon case, the claims were asserted at least one of or at least more than one of, and there was no limitation as to what claims were at issue, nor at the hearing. And there were two hearings, one for Amazon and Judge O'Grady held a separate one for HTC. Was there ever a limitation of what claims were at issue provided by plaintiff's counsel? So we address all claims, and at the hearings, Amazon and us treated all claims equally. So, yes, I think all claims stand invalid. And by the way, they're all based on the same abstract idea. Thank you, counsel. Mr. Devlin has a couple of minutes for rebuttal if he needs it.  There are a lot of assertions being made here with zero evidence behind them. We just heard that not only is every feature conventional, the ordered combination is conventional, the ordered combination is not invented. We just heard that. The district court said the same thing. There is zero evidence in the record of that. And, in fact, it flies in the face of what evidence is in the record. Patent Office allowed these patents over hundreds of prior references, many of which were directed to the same interoperability of devices, cell phones, other household devices. There was a ton of work going on in the industry directed to these very issues, and yet these inventors came up with something that the Patent Office has deemed new and non-obvious and therefore not conventional, not only in light of regular examination, but in the face of IPR petitions, which were overcome by the vast majority of these claims. So to say without a shred of evidence that there's nothing new here, that this whole combination was conventional, is not only wrong to do at the Rule 12 stage, but it's false. And that's what the district court did as well. The district court, throughout its opinion, makes numerous, what are effects, subsidiary factual findings, sweeping away dozens of claims in an analytical path that never actually looks at the ordered combination of any claims, but instead focuses on individual elements, calls them unconventional. Judge Devlin, let me ask you, does a ruling in your favor on the 101 issue automatically insulate and save all of the 492 patent claims? The 492 family claims. I think one of two directions could be taken here. I do think that the district court unfairly treated every single claim, and that every single claim should at least go back to the district court for fair treatment. Even if we ruin your favor? I do think they're all patentable. That's number one. At a minimum, they're not unpatentable on this record. And then to get to Your Honor's question, at least some of them, there are distinctions. We heard again, only 26 of the claims actually recite the conversion module. Well, those are different than the others, and these claims should be looked at individually. Now, assuming one looks at it the other way, and you don't prevail on what you've argued on the 492 patent, what is there in the other claims in the family that aren't in the appendix before it, I mean, that aren't specifically asserted, what is there that sets them aside differently from these claims, from the 492 patent? I'll note that I'm beyond my time, so I'll try to be very quick. There's all sorts of collections of claims throughout the family, both within the 492 patent, there's variants, and of course with others. But I'll go back to where I started. Think about a collection of elements that involves not only just receiving some signal, processing it, and sending it out, but an HD signal that's received over a cellular network in a certain way, processed in a certain way, sent out to an HDTV over an HD interface, and at the same time receiving power back from that interface to charge your phone, and having a certain buffering, or excuse me, a throughput rate, it's all recited in a single claim. That's very, very different from this abstract idea we're talking about. Thank you, counsel. Thank you. We have your case, we'll take the case under advisement. Thank you.